WESTINGHOUSE ELECTRIC
CORPORATION, Plaintiff,

v.

RIO ALGOM LIMITED, Rio Algom Corporation, Rio Tinto Zinc Corporation Limited, RTZ Services Limited, Rio Tinto Zinc Corporation, Conzinc Rio Tinto of Australia Limited, Mary Kathleen Uranium Limited, Pancontinental Mining Limited, Queensland Mines Limited, Nuclear Fuels Corporation, Anglo-American Corporation of South Africa, Limited, Engelhard Minerals and Chemicals Corporation, Denison Mines, Limited, Denison Mines (U. S.) Incorporated, Noranda Mines Limited, Gulf Oil Corporation, Gulf Minerals Canada Limited, Kerr-McGee Corporation, the Anaconda Company, Getty Oil Company, Utah International Inc., Phelps Dodge Corporation, Western Nuclear, Inc., Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, Federal Resources Corporation and Pioneer Nuclear, Inc., Defendants.

No. 76 C 3830.

United States District Court,
N. D. Illinois, E. D.

April 18, 1978.

Fred H. Bartlit, Jr., Michael T. Hanna-fan, Kirkland & Ellis, Lee A. Freeman, Jr., Freeman, Rothe, Freeman & Salzman, Chicago, Ill., for plaintiff Westinghouse Electric Corp.

Rio Algom Ltd., in default.

Albert E. Jenner, Jr., Keith F. Bode, Jenner & Block, Chicago, Ill., for Rio Algom Corp.

Rio Tinto Zinc Corp. Ltd., in default.

RTZ Services Ltd., in default.

Paul G. Gebhard, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Richard E. Sherwood, Robert E. Willett, O'Melveny & Meyers, Los Angeles, Cal., for Rio Tinto Zinc Corp.

Conzinc Rio Tinto of Australia Ltd., in default.

Mary Kathleen Uranium Ltd., in default.

Pancontinental Mining Ltd., in default.

Queensland Mines Ltd., in default.

Nuclear Fuels Corp., in default.

Anglo-American Corporation of South Africa, Ltd., in default.

Lionel G. Gross, Kenneth Gaines, Susan A. Henderson, Altheimer & Gray, Chicago,

Ill., Raymond L. Falls, Jr., Henry Bisgaier, Cahill, Gordon & Reindel, New York City, for Engelhard Minerals and Chemicals Corp.

Richard L. Blatt, Michael P. Tone, Peterson, Ross, Rall, Barber & Seidel, Chicago, Ill., Laurence V. Senn, Jr., Lance Gotthoffer, Mudge, Rose, Guthrie & Alexander, New York City, for Denison Mines, Ltd. and Denison Mines (U. S.) Inc.

Joseph S. Wright, Michael D. Freeborn, Eugene H. Ruark, R. Newton Rooks, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda Mines, Ltd.

Robert C. Keck, Thomas R. Shaver, Robert A. Creamer, Keck, Cushman, Mahin & Cate, Chicago, Ill., Edward F. Howrey, A. Duncan Whitaker, Howrey & Simon, Washington, D. C., Frank W. Morgan, Sr., Counsel, Gulf Companies, Pittsburgh, Pa., for Gulf Oil Corp. and Gulf Minerals Canada Ltd.

Glen W. McGee, Thomas W. Johnston, Brian J. Redding, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee Corp.

W. Donald McSweeney, Roger Pascal, Schiff, Hardin & Waite, Chicago, Ill., Melvin D. Goodman, Zachary Shimer, Chadbourne, Parke, Whiteside & Wolff, New York City, for the Anaconda Co.

Richard M. Calkins, James W. Hathaway, Burditt & Calkins, Chicago, Ill., Brenton F. Goodrich, Carl J. Schuck, Overton, Lyman & Prince, Los Angeles, Cal., for Getty Oil Co.

Watson B. Tucker, Theodore A. Livingston, Wm. Bruce Hoff, Jr., Mayer, Brown & Platt, Chicago, Ill., for Utah International Inc.

Andrew C. Hartzell, Jr., Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps Dodge Corp. and Western Nuclear, Inc.

Theodore A. Groenke, J. Craig Busey, McDermott, Will & Emery, Chicago, Ill., David M. Balabanian, McCutcheon, Doyle, Brown & Enersen, San Francisco, Cal., for Homestake Mining Co.

Edward L. Foote, Winston & Strawn, Chicago, Ill., Michael V. Corrigan, Simpson, Thacher & Bartlett, New York City, for Atlas Corp.

Richard P. Campbell, McConnell & Campbell, Chicago, Ill., for Reserve Oil and Minerals Corp.

Robert T. Johnson, Jr., John T. Loughlin, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., Harry L. Bigbee, W. Perry Pearce, Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., W. Latham Leeds, Johnson, Bromberg, Leeds & Riggs, Dallas, Tex., for United Nuclear Corp.

Richard K. Decker, Joseph E. Coughlin, Lord, Bissell & Brook, Chicago, Ill., Leonard J. Lewis, Gerald Miller, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for Federal Resources Corp.

Thomas D. Allen, Edward T. Butt, Jr., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Pioneer Nuclear, Inc.

## MEMORANDUM OPINION

MARSHALL, District Judge.

At issue in this complex antitrust litigation are a multitude of motions to disqualify counsel, on the grounds that the present litigation posture of two law firms creates a conflict of interest with their prior representation of several of the corporate defendants in earlier legal settings. The disqualification issues pose sensitive and difficult problems of legal ethics under the ABA's Code of Professional Responsibility. They also raise the unsettled question of whether the mechanical disqualification of law firms for ethical transgressions is an appropriate judicial remedy in cases involving large multi-city corporate law firms, enormously complex multi-district litigation, and corporate litigants with nationwide and even multi-national connections.

With the modern-day proliferation of large law firms representing multi-billion dollar corporations in all segments of the economy and the governmental process, it is becoming increasingly difficult to insist upon absolute fidelity to rules prohibiting attorneys from representing overlapping le-

gal interests. While a recognition of these pragmatic realities may contribute to a broader perspective on current ethical problems, our paramount obligation is to balance an individual's freedom to choose his own counsel with the need to preserve the highest ethical standards for professional conduct. In fulfilling this task, we are guided by the words of Judge Kaufman that the resolution of ethical problems rests on a "painstaking analysis of the facts and precise application of precedent." *United States v. Standard Oil Company*, 136 F.Supp. 345, 367 (S.D.N.Y.1955).

The present action is one phase of a complex and continuing series of lawsuits involving the purchase and sale of uranium used in nuclear reactors. The triggering event occurred on September 8, 1975, when Westinghouse Electric Corporation (Westinghouse), a major manufacturer of nuclear reactors, notified a number of utility companies that performance of 17 of its long-term uranium supply contracts had become "commercially impracticable" under § 2–615 of the Uniform Commercial Code. In its notice, Westinghouse explained that unforeseen contingencies in the uranium market, including the 1973 Arab oil embargo, had caused extraordinary increases in uranium prices and a shortage of uranium supplies. Faced with a significant cost-price differential affecting the scheduled delivery of some 65 million pounds of uranium over the next 20 years, Westinghouse said that the unforeseen events excused full performance of its contractual obligations. In response, the affected utilities filed 13 federal actions, one state action, and three foreign actions against Westinghouse alleging breach of contract and challenging Westinghouse's invocation of § 2–615. The federal actions have been consolidated for trial in the Eastern District of Virginia.

As an outgrowth of its defense of these contract actions, Westinghouse investigated the possibility that the uranium price increases were caused by conspiratorial activities of the uranium producers. On October 15, 1976, Westinghouse filed the present antitrust action in this Court against 12 foreign and 17 domestic corporations engaged in various aspects of the uranium industry. Westinghouse alleges that beginning in 1972, certain of the foreign defendants entered into a cartel agreement to rig bids, fix prices and contract terms, divide and allocate the world uranium market among the uranium producers, and require Westinghouse and other uranium resellers to pay discriminatorily high prices. The complaint also charges that the foreign defendants agreed to extend the effects of their cartel to the United States, in order to benefit their U. S. subsidiaries and to prevent price competition from other U. S. uranium producers and sellers. To cement this American connection, the foreign producers allegedly struck a bargain with U. S. producers, whereby the foreign producers promised not to underprice the U. S. producers and the domestic producers in return agreed to drop their opposition to the U. S. government's phase-out of its embargo on the enrichment of foreign uranium. The domestic producers, with the advice and support of the foreign producers, allegedly adopted contracting and pricing policies designed to raise current uranium prices to levels fixed by the foreign cartel. It is also charged that the U. S. producers agreed to withdraw uranium from the market, to boycott Westinghouse, to lobby foreign officials to refuse to sell uranium to Westinghouse, and to exchange market information in order to raise and stabilize prices. The effect of these actions, according to the complaint, has been to raise uranium prices to artificially high levels, fix the terms on which uranium is sold, curtail uranium supplies, divide the uranium market among the defendants, and deprive uranium purchasers of competition among producers, all to the injury of Westinghouse. For relief, Westinghouse seeks a declaration that defendants' conduct violates Section 1 of the Sherman Act and Section 73 of the Wilson Tariff Act, treble damages, and injunctive relief.

Throughout the uranium litigation, Westinghouse has employed Kirkland & Ellis as its lead counsel. The Kirkland firm is a two-city operation, with offices in Chicago

and Washington, D. C. Its Washington office uses the name Kirkland, Ellis & Rowe. We will refer to the combined firm as Kirkland. Kirkland's Chicago lawyers number over 130, and its Washington branch contains about 40. Kirkland's representation of Westinghouse extends back into the early 1960's, and the uranium litigation alone has required the efforts of from 8 to 14 of its attorneys. In conducting the contract aspect of the litigation alone, Kirkland has reviewed large portions of the millions of documents produced, has conducted hundreds of depositions and interviews, and has generated some 2½ million dollars in legal fees.

The antitrust defendants have filed a host of motions to disqualify Kirkland & Ellis as Westinghouse's counsel in the antitrust phase of this massive litigation. Their motions can be divided into three categories.

First, three oil company defendants (Kerr-McGee, Getty and Gulf) charge that on the same day Kirkland's Chicago office was filing a complaint attacking them for anticompetitive practices in the sale and pricing of uranium, Kirkland's Washington office was presenting an extensive legislative report to the American Petroleum Institute (API), a trade association, which develops the completely opposite thesis. The report argues in part that petroleum company involvement in the uranium field has had the beneficial effect of promoting competition in America's energy industries. The API commissioned the Kirkland study as part of an extensive lobbying effort directed at defeating proposed Congressional legislation which would have required oil and gas companies to relinquish their investments in alternative energy industries, including coal, uranium, geothermal and solar energy. All three oil companies are corporate members of the API. In the course of their participation in the study, they assert that they gave confidential industry and market data to Kirkland attorneys. Relying on Canons 4, 5 and 9 of the Code of Professional Responsibility the oil companies claim that Kirkland's simultaneous representation of both Westinghouse and the API creates a substantial conflict of interest, a potential for disclosure of confidential information, and the appearance of impropriety. To extinguish these adverse and potentially harmful interests, they demand the disqualification of the entire Kirkland firm or, alternatively, the dismissal of the oil companies from the present action.

Second, twelve other corporate defendants presume the validity of the API motions and argue that if those companies are dismissed, equitable considerations compel the court to disqualify Kirkland from suing the remaining defendants. Without raising any additional charges of conflicting interests, they argue that if ethical policies force Kirkland to reduce the number of antitrust defendants, the remaining defendants will suffer several forms of prejudice. First, Kirkland's inability to prosecute the oil companies would require it to shift the blame to the remaining defendants. As a result, the jury would be presented with a distorted and truncated picture of the alleged industry cartel. Second, Kirkland's obligation to withhold confidential information gained during its API engagements would inhibit Kirkland's questioning of the oil company defendants after their dismissal if they are deposed or called as witnesses by the remaining defendants. Finally, Kirkland's role as an expert consultant to API on energy matters may make it necessary for Kirkland attorneys to be called as witnesses against Westinghouse and to explain why the API report appears to negate the claim of anti-competitive conduct in the uranium industry.

The third motion to disqualify is made by defendant Noranda Mines Limited, a Canadian corporation, and is completely independent of the other motions. Noranda asserts a direct conflict of interest resulting from Kirkland's prior representation of Noranda. From 1965 until 1967, Kirkland represented Noranda in several matters, including negotiations for the purchase of 51% of the shares of Essex Wire Corporation. Noranda claims that during this time Kirkland acquired intimate knowledge of its corpo-

rate organization, officers, marketing methods, business philosophy, and its business contacts with the United States. Noranda argues that these matters, especially Noranda's relationship with American-based or American-involved subsidiaries, provide the basis for Kirkland's allegations against Noranda in the Westinghouse suit. Citing Canons 4 and 9, Noranda contends that Kirkland's adversarial posture in the present litigation creates a conflict of interest, provides the potential for disclosure of confidential information, and gives rise to the appearance of impropriety.

The Kirkland firm has responded to these motions with a vigorous denial that any of them contains an appropriate basis for its disqualification as Westinghouse's counsel. Although Kirkland does not attempt to rebut the charge that the Westinghouse complaint and the API report take inconsistent legal positions, it argues forcefully that none of the oil companies has demonstrated an essential prerequisite to their disqualification motions, namely the existence of an attorney-client relationship between those companies and the Kirkland firm. Kirkland argues that its professional employment has extended only to Westinghouse and API, not to any of API's member companies, and that its requests in the uranium contracts litigation, its contemporaneous written communications, and its course of dealings with the oil companies all negate the claim that Kirkland ever acted as their attorney. In addition, Kirkland contends that the API study did not produce any significant confidential information which has been or will be used against the oil companies in this case. Finally, Kirkland argues that any actual or apparent prejudice to the oil companies is strongly outweighed by the great hardship which would fall upon Westinghouse from Kirkland's disqualification in such a complex and lengthy chain of lawsuits.

In response to the other sets of motions, Kirkland contends that the arguments of the twelve other defendants are totally dependent on the merits of the oil company motions, and will be mooted by a denial of those motions. In any event, says Kirkland,

those twelve companies lack standing to press their claims of prejudice since they admittedly were never clients of the Kirkland firm. Finally, in countering Noranda's motion, Kirkland concedes that Noranda was a former client, but contends that there is no substantial relationship between Kirkland's 1967 legal advice to Noranda on the proposed acquisition of a cable and wire company and its present prosecution of a uranium price-fixing conspiracy which is not alleged to have begun until 1972. Absent such a relationship between the past and present representations, says Kirkland, there is an insufficient adversity of legal positions to create a conflict of interest.

The issues in the three sets of motions have been exhaustively briefed. The factual allegations are supported by a plethora of affidavits, counter-affidavits and documentary evidence. Since the bulk of the materials pertain to the oil company motions, we will review those facts first. In doing so, our attention will be focused on three main issues: 1) the existence of an attorney-client relationship between the oil companies and Kirkland; 2) the quantitative and qualitative character of confidential information which the companies divulged to Kirkland; and 3) the contemporaneous knowledge and understanding of the companies and Kirkland in participating in the API study and the pending uranium contracts litigation.

The story begins with an analysis of Kirkland's involvement with the American Petroleum Institute (API). The API is a national petroleum trade association with 350 company and 7,500 individual members. It performs a wide variety of cooperative efforts for the petroleum industry. It develops technical measurement standards for petroleum equipment, and functions as a clearinghouse and forum for informational exchange and technical research. In addition, it monitors the status of industry-related legislation and attempts to articulate and gain support for the industry position with Congress, the media and the public at large. Kerr-McGee, Getty and Gulf are substantial dues-paying members of API.

Getty and Kerr-McGee are represented on the API's Board of Directors.

In October, 1975 Congress was presented with legislative proposals to break-up the oil companies both vertically, i. e. by separating their control over production, transportation, refining and marketing entities, and horizontally, i. e. by prohibiting cross-ownership of alternative energy resources in addition to oil and gas. To the surprise of many, the divestiture proposals drew the support of about forty U. S. senators. (Hefler Exh. 15, p. 3). The votes sent shock waves through the oil industry, since this proposed legislation threatened oil companies with a potential divestiture of millions of dollars of assets.

In November, 1975, the API launched a "Committee on Industrial Organization" to lobby against the proposals. According to one Committee member, the Committee was established "for the purpose of giving leadership to a major effort by the API to bring to the attention of the American public and Congress accurate, factual information . . ." on the divestiture legislation. (Lea, ¶ 4). In a mailgram dated December 10, 1975, Frank Ikard, API's president, asked "that each company designate one of its senior executives as coordinator or point of contact—an individual who will be familiar with the economic, legal, and public relations projects relating to divestiture/diversification being carried on by your company." (Hefler Exh. 2). The company contacts were intended to facilitate coordination of the Committee's activities with the individual companies. Ikard also stated that the Committee would be asking the oil companies for help and cooperation in providing additional manpower in the anti-divestiture campaign.

The Committee was organized into five task forces. An Economics and Analysis task force coordinated economic studies. A Public Affairs Task Force coordinated public relations. The External Constituencies Task Force sought support for the Committee's goals from various groups both within and outside the oil industry. The Governmental Relations Task Force kept an eye on developments on Capitol Hill. Finally, the Legal Task Force, which is the task force with relevant connections to the present motions, ". . . ha[d] the responsibility of conducting studies and legal research into the implications of divestiture and the adequacy of existing laws to keep the industry competitive." Each task force was headed by a senior executive from one of API's member oil companies. In the case of the Legal Task Force, the leadership spot was held by L. Bates Lea, General Counsel of Standard Oil Company of Indiana. Lea was assisted by Stark Ritchie, API's General Counsel. (Hefler Exh. 4).

In a January, 1976 letter to the company contacts in which he described the task forces, the Committee's Project Director noted that "you will, from time to time, be receiving requests from me or from each of the various task forces." Recognizing the need for grass roots support from the API's corporate members, he added that "this Committee is small and cannot possibly, without the help of the companies, hope to accomplish the prodigious task it faces." (Hefler Exh. 4).

In his capacity as head of the Legal Task Force, Lea "concluded that it would be useful to have a law firm conduct an overall review of the whole subject of oil company energy diversification . . ." (Lea, ¶ 5). The review was to include an analysis of the structure of energy industries and of the economic and antitrust consequences of the proposed legislation. According to Lea, "the results were to be embodied in a final report which could serve as source material for those interested in the subject." (Lea, ¶ 5).

Lea found that Frederick M. Rowe, an attorney in Kirkland's Washington office, was willing to take the assignment. After consultation, Stark Ritchie concurred in Lea's recommendation to retain Mr. Rowe (Lea, ¶ 6). On February 25, 1976, Ritchie wrote a letter on API stationery to Rowe confirming the retention of the Kirkland firm on this assignment. (Ritchie Exh. 1). On May 4, 1976, Ritchie specified in a letter to Rowe that Kirkland's work should in-

clude the preparation of possible Congressional testimony and an analysis of the legislation's probable effect on oil companies which would have to divest assets. (Ritchie Exh. 2). To collect the data on those assets, Ritchie stated that API would arrange for interviews by Kirkland with a cross-section of industry personnel. He also added the following significant statement to the letter:

"Your firm will, of course, act as an independent expert counsel and hold any company information learned through these interviews in strict confidence, not to be disclosed to any other company, or even to API, except in aggregated or such other form as will preclude identifying the source company with its data."

According to Ritchie, these instructions on confidentiality were intended to protect the companies' proprietary information and to preclude the exchange of the information among the competitor members of API. (Ritchie, ¶ 5).

At Ritchie's request, the corporate interviews were mainly arranged by Gerald Thurmond, who was Washington counsel for Gulf and a member of API's Antitrust Strategy Group. (Ritchie, ¶ 4). On May 11, 1976, Thurmond scheduled an interview with Gulf officials to be held in Denver on May 20. (Mingee, Exh. A). Thurmond also called P. J. Hefler, API's company contact at Kerr-McGee, on May 24, 1976 to inform him of Kirkland's interviewing plans. (Hefler Exh. 7). The next day, Hefler returned a call from Nolan Clark, an attorney in Kirkland's Washington office, who asked to interview Kerr-McGee employees on a confidential basis. (Hefler, ¶ 9).

Nolan Clark had been assigned by Frederick Rowe to take primary responsibility for the data collection, analysis, and drafting of the API report. (Rowe, ¶ 3). During the period of May through December, 1976, Thurmond conversed with Rowe and Clark on several occasions to discuss strategies and industry impact in connection with the horizontal divestiture legislation. Thurmond states that he "was given to believe that the Kirkland firm was representing both API and Gulf Oil" on the divestiture work. (Thurmond, ¶¶ 6–8). In opposition to this statement, Clark asserts that he knows of no basis for the belief that Kirkland represented Gulf, that Thurmond never expressed or suggested that he held such a belief, and that Clark never made such a representation to any Gulf personnel. (Clark, ¶ 13).

Nolan Clark handled most of the interviews of industry personnel. (Rowe, ¶ 6). According to Clark, the interviews were designed to ascertain the probable effects of the divestiture legislation, to obtain information for API's anti-divestiture arsenal, and to help identify publicly available materials which could be published in an API report. (Clark, ¶ 4). Clark was aware of the confidentiality restrictions imposed in Ritchie's May 4 letter.

Clark ultimately interviewed representatives of eight oil companies between April 29 and June 15, 1976. The companies included Gulf and Kerr-McGee, but not Getty. (Clark ¶ 7). In preparation for the Gulf interviews, Clark submitted a ten-page list of proposed questions to Thurmond, Gulf's Washington counsel, who forwarded them to Gulf personnel. (Thurmond, ¶ 7; Clark, ¶ 8). The questions were intended to elicit information on the economic consequences of the legislation, and to gather the most effective arguments against the proposed divestiture measures. (Clark, ¶ 6). The Gulf interviews were eventually held on May 28, 1976 and Kerr-McGee personnel were interviewed on June 9, 1976.

Before these interviews took place, Ritchie sent a May 25 cover letter and survey questionnaire to 59 API companies. (Ritchie, ¶ 6). In the introductory memorandum to the questionnaire, Ritchie made several representations which are important to the present questions. (Hefler, Exh. 9). First, he stated that Kirkland had been retained by the API "to assist in preparing positions, arguments and testimony in opposition to" the divestiture legislation. Second, he stated that Kirkland needed two types of publicly unavailable information in order to complete its objective study of the

legislative impacts of the pending bills. That information consisted of the estimated value of assets invested in alternative energy fields that the companies would have to divest if the legislation were passed, and the past and projected outlays for research and development in these fields. Ritchie asked that the data be sent directly to Kirkland, not to the API. Finally and most importantly, Ritchie stated that:

> Kirkland, Ellis & Rowe is acting as an independent special counsel for API, and will hold any company information in strict confidence, *not to be disclosed to any other company, or even to API*, except in aggregated or such other form as will preclude identifying the source company with its data. (emphasis in original).

This language paralleled similar instructions from Ritchie to the Kirkland firm on May 4. Consistent with this assurance, Ritchie advised the companies that they need not identify their companies by name when completing the questionnaires. According to Kerr-McGee, these communications were the beginning of an attorney-client relationship between Kerr-McGee and Kirkland. (Brief, p. 7).

R. J. Hefler, a Kerr-McGee Vice-President and API's company contact on the divestiture legislation, received the Ritchie memorandum "shortly after May 25," and apparently prior to his June 9 interview with Nolan Clark. (Hefler, ¶ 10). James Mingee, a Gulf Vice-President, received the memorandum on June 8, some ten days after his May 28 interview with Clark. (Mingee, ¶ 8). With both Kerr-McGee and Gulf, the memorandum had been addressed to the company's general counsel and forwarded to the respective executives.

The May 28 interview with Gulf personnel was held in Denver. At the request of Gulf personnel, Dr. I. C. Bupp of the Harvard Business School also attended the sessions. (Clark, ¶ 9). Dr. Bupp was connected with Management Analysis Center, Inc. (MAC), a business consulting group employed by API to compile a publishable report on the desirability and economic impact of the horizontal divestiture legislation.

At least seven Gulf executives, and Gulf's regional attorney, attended the May 28, 1976 meeting. Mr. Mingee, who arranged the meeting and attended as a Gulf Vice-President, provided his contemporaneous understanding of the expected tenor and scope of the interviews in a May 27 intra-office memo to the other participants. In the memo he noted that Kirkland "has been hired by API to prepare material for congressional hearings on horizontal divestiture" and that "Dr. I. C. Bupp is working with API on the same subject." (Mingee Exh. B). Mingee expressed his hope that their questions could be satisfactorily answered "through an informal discussion," since the preparation of written answers "may complicate the subject severely because undoubtedly it would require time consuming approvals at higher levels, perhaps even Pittsburgh." (*Id.* Exh. B).

For the description of the topics discussed on May 28, we refer to the uncontradicted affidavit of Nolan Clark. (See Clark Aff., ¶ 12). Clark confirmed his recollection of the meeting with Dr. Bupp. At the beginning of the discussion, Clark was introduced as an attorney for API. Mr. Allen, Gulf's regional counsel, suggested that discussion focus first on legal consequences of divestiture, such as bank approval of the sale of assets, performance guarantees, and the handling of retirement liabilities. After Mr. Allen left, Dr. Bupp asked questions on uranium pricing and marketing, including how Gulf set uranium prices. Gulf personnel responded that they relied on published data for uranium prices. According to Clark, this was the substance of the uranium pricing discussion, and all questions on that subject were posed by Dr. Bupp. Clark has submitted his notes of the meeting to the court for *in camera* inspection in order to protect any proprietary information, and although they are in a cryptic and abbreviated form, they suggest that the discussion included consideration of capital investments, production costs, and exploration expenditures in Gulf's uranium, coal,

oil, oil shale and gas industries. The entire meeting lasted more than two hours.

Nolan Clark's interview with Kerr-McGee officials took place in Oklahoma City on June 9, 1976. Those officials were R. J. Hefler, Kerr-McGee's Vice-President for Public Services, and George Cobb, Executive Vice-President. Mr. Cobb was chosen because of his long experience with the company and his extensive knowledge of uranium and coal. (Hefler, ¶ 11). Clark, Cobb and Hefler were the only persons present during the interview. No Kerr-McGee lawyers attended. At the outset of the meeting, in response to a question about Clark's affiliation and the purpose of the meeting, Clark told Cobb and Hefler that pursuant to Kirkland's retention by the API on the horizontal divestiture legislation he was interviewing industry personnel to analyze the probable consequences of the legislation. (Clark, ¶ 14; Hefler, ¶ 12). Hefler understood Clark to explain that Kirkland was working on behalf of API and also its members such as Kerr-McGee. (Hefler, ¶ 12). Clark denies he made any statement that Kirkland was working on behalf of any of the API's member companies and knows of no basis for Hefler's belief that Kirkland was representing Kerr-McGee. Neither Cobb nor Hefler expressed that belief during the meeting, according to Clark's recollection. (Clark, ¶¶ 14, 16). Both Clark and Hefler agree that Clark made assurances that the information disclosed during the interview would be held in confidence, but Hefler asserts that that assurance extended to all information, while Clark claims it extended only to proprietary information, which could be disclosed in aggregate form, in conformity with earlier written communications from Stark Ritchie.

Both Clark and Hefler agree that the conversation focused on the legislation's impact on Kerr-McGee uranium and coal assets, which it would be forced to divest. (Hefler, ¶ 13; Clark, ¶ 15). Clark was given considerable background information on Kerr-McGee's uranium industry, including mining locations, uranium conversion process, and pellet fabrication. Clark states that virtually all the information provided was publicly available. (Clark, ¶ 15). On the subject of uranium marketing and pricing, Cobb described the escalating prices and tightening supplies in the current market, and the reasons behind the trends. (Hefler, ¶ 13). The session lasted about three hours.

As noted earlier, Kirkland did not interview any Getty personnel. However, Getty received the confidential API questionnaire which requested Getty to estimate the value of its assets subject to proposed divestiture and its research and development outlays in alternative energy fields. Getty completed the questionnaire and mailed its data sheets to Nolan Clark on June 4, 1976, with the understanding that the data would be held in confidence. (Copley aff., ¶ 3). Getty's Vice President states that in submitting the data, he "acted upon the belief and expectation that such submission was made in order to enable [Kirkland] to render legal service to Getty in furtherance of Getty's interests." (Copley, ¶ 7). In opposition to this statement, Clark asserts that he knows of no basis for Copley's belief and expectation, that he never even suggested that the data was to be used except for Kirkland's report for API, and that Copley's belief was never expressed to him during the course of the study. (Clark, ¶ 23).

Gulf submitted financial information and its completed questionnaire to Kirkland on August 10, 11 and 13, 1976. (Mingee, ¶¶ 10, 11, 12). In each instance, Mr. Mingee stated in his cover letter that Gulf supplied the information on a confidential basis with the understanding that it would be aggregated in the industry and that it would not be reported separately without Gulf's prior written consent. (Mingee Exh. E, F, and G).

Kerr-McGee sent its completed questionnaire to Nolan Clark on August 25, 1976. (Hefler, ¶ 16).

In his affidavit, Nolan Clark explains that the questionnaires were sent directly to him in order to protect any data which the oil companies classified as proprietary information. (Clark, ¶ 17). This procedure

eliminated the possibility that industry competitors could obtain the data through API. Clark states that none of the submitted data was used in the API report except in aggregate form. (Clark, ¶ 20). Clark asserts that except for the aggregated data on oil company assets and research and development expenses in alternative energy fields, all quantitative data used in the API report was derived from publicly available sources. (Clark, ¶ 28). He also reveals that some oil companies, such as Gulf, were receiving requests for data on their research and development outlays from the MAC group as well as API. (Clark, ¶¶ 21–22). The MAC survey form asked for some of the same data as was requested in the API questionnaire, although it is somewhat less comprehensive. (Clark, Exh. A, Attachment B). In addition, Clark sent to Gulf a request from First Boston Corporation for financial information on the coal interests of oil companies, a subject which was also partially included in the API survey. (Clark, ¶ 24). Gulf eventually supplied some or all of the requested data, and First Boston summarized its findings at a public symposium.

The final disposition of the oil company data sheets was settled in October, 1976. During their work on the API report, Rowe and Clark became concerned that legislative committees might subpoena the data sheets and that Kirkland might not be able to resist disclosure to Congress. (Clark, ¶ 25). Therefore, they decided to return the API questionnaires to the companies when the report was completed. This decision was conveyed to Stark Ritchie on October 15, the same day the final report was submitted to the API. The Ritchie letter does not contain Clark's currently proffered rationale for the return of the data. (Clark, Exh. E). The questionnaires were ultimately returned to Gulf, Getty and Kerr-McGee on October 29, 1976.

Before its October 15, 1976 release date, the API report went through several drafts, which were sent to some API members for review and comments (Clark, ¶ 26). Both Hefler (Kerr-McGee) and Thurmond (Gulf) received copies of the drafts. (Hefler ¶¶ 15,

18; Thurmond, ¶ 9). For our purposes, we find it unnecessary to discuss the content of the preliminary versions of the API report.

The final API report is a voluminous document, containing some 230 pages of text and supported by 82 pages of exhibits. A major section of the report is devoted to a description of oil company participation in various energy fields, including coal, uranium, geothermal energy, oil shale, tar sands, synthetic fuels from coal, and solar energy. Other sections analyze United States energy requirements, examine and criticize the arguments put forward in support of the horizontal divestiture bill, describe the legislation's negative impact on the economy and on energy production, and evaluate the legislation's lack of harmony with antitrust principles, historical lessons and public policy. Uranium is the primary subject of about 25 pages of text and 11 pages of exhibits. References to uranium appear throughout the report.

On the same day that the final API report produced by Kirkland's Washington office was published, Kirkland's Chicago office filed the present complaint on behalf of Westinghouse against 29 uranium producers, including Kerr-McGee, Getty and Gulf. A comparison of the two documents reveals a rather basic conflict in their contentions and underlying theories. Because a major argument behind the divestiture legislation was that oil company participation in alternative energy fields creates anti-competitive pressures on the economy, the report marshalls a large number of facts and arguments to show that oil company diversification does not threaten overall energy competition. In particular, the report asserts that the relatively high concentration ratios in the uranium industry can be expected to decline (III 20–21), that current increases in uranium prices are a result of increasing demand (III 22–23), that oil company entry into uranium production has stimulated competition (V 10, 29) and diminished concentration (V 12, VI 13), that oil companies have no incentive to act in concert to restrict coal or uranium production (VI 18–19), and that the historical record refutes

any charge that oil companies have restricted uranium output. (VI 24). The report concludes that "the energy industries, both individually and collectively, are competitive today and are likely to remain so." (VI 34). In contrast, the major theory of the Westinghouse complaint is that uranium producers such as Gulf, Getty and Kerr-McGee have conspired to destroy competition in uranium marketing and pricing. To that end, they have allegedly coordinated production, withheld uranium from the market, fixed prices at artificially high levels, and generally suppressed competition in uranium marketing. Perhaps in recognition of the diametrically opposing theories of the API report and the Westinghouse complaint, Kirkland does not attempt to rebut the oil companies' charges that it has simultaneously taken inconsistent positions on competition in the uranium industry.

The prominence of this conflict is more easily discerned from the documents themselves than from the contemporaneous activities of the Kirkland firm. Not only did completely different Kirkland attorneys work on the two matters, but the attorneys were segregated between the Washington and Chicago firms. In addition, Kirkland's investigation of antitrust violations by uranium producers was treated as a highly confidential matter, which was not disclosed even within the firm to anyone not directly involved in the Westinghouse matter. Securities law dictated that public disclosure of the possible antitrust lawsuit be prevented. (Jentes, ¶ 15). Consequently, although the Washington office did know of Kirkland's representation of Westinghouse on the utility contracts litigation, none of the Washington attorneys working on the API divestiture assignment knew of the separate Westinghouse antitrust complaint until it was filed in court on October 15, after the stock exchanges closed on that day. (Rowe, ¶¶ 8–9; Clark, ¶ 29). The Chicago attorneys also had little awareness, if any, of the API work by the Washington office. Although the attorneys working on the Westinghouse complaint do not profess complete ignorance of the API representation by their brothers in Washington, they state that they did not communicate with the Washington attorneys about the API work prior to October 15 and had no knowledge of the data collected for the API report. (Jentes, ¶ 17; Locke, ¶ 3; Newton, ¶ 17; Sonda, ¶ 14; Wilson, ¶ 3; Bartlit, ¶ 10; Goold, ¶ 5; Haubold, ¶ 4). Nolan Clark and Frederick Rowe confirm that they never disclosed any information from the API questionnaires or interviews to any lawyer in the Chicago office. (Clark, ¶ 30; Rowe, ¶ 25).

There is one partial overlap between Chicago and Washington attorneys in connection with the API anti-divestiture efforts. The overlap involves the work of William Jentes, who was one of Kirkland's lead attorneys working on the Westinghouse antitrust complaint. In August, 1976, L. Bates Lea, as head of API's Legal Task Force on the divestiture legislation, arranged for Jentes to prepare a legal memorandum analyzing arguments which had been advanced to broaden the scope of existing antitrust laws to outlaw interlocking directorates. (Jentes, ¶ 16; Lea, ¶ 8). The issue had been raised by proponents of the divestiture legislation as an example of the collusive behavior of large corporations. Since Lea's own legal staff at Standard Oil was fully committed on other matters, Lea farmed out the task to Kirkland. (Lea, ¶ 8). Lea forwarded the Kirkland memo to the API, which mailed it to its company contacts on September 23, 1976. Kirkland's fees were paid by Standard, and no Kirkland attorney working on the memo had any contact with any API representative except Lea. (Jentes, ¶ 16). The memorandum addresses the antitrust issues from a predominantly theoretical perspective, and does not contain one word on uranium. (Hefler, Exh. 13).

In view of this rather rigid separation between Kirkland attorneys working on the Westinghouse antitrust complaint and the API report, it is understandable that officials of Getty, Gulf and Kerr-McGee state that they were never told by Clark or Rowe that Kirkland was considering an antitrust action against those companies, and were

never told of any possible conflict between Kirkland's dual engagements. (Thurmond, ¶ 8; Cody, Rebuttal Aff., ¶ 4; Copley, ¶ 5; Heimann, ¶ 5; Hefler, ¶ 14). A Gulf official maintains that if he had been aware of such facts, he would not have released the data in the API questionnaire to Kirkland. (Copley, ¶ 5).

Following the filing of the Westinghouse complaint and the publication of the API report, Kirkland and API personnel made a number of efforts apparently intended to minimize the possibility of a conflict of interest. On October 20 Stark Ritchie, API's General Counsel, telephoned William Heimann, General Counsel of Kerr-McGee, to report that he had been assured by Fred Rowe that no Kerr-McGee data obtained for the API report had been or would be made available to Kirkland attorneys working on the Westinghouse case. (Heimann, Exh. A). Rowe confirms this conversation with Ritchie. (Rowe, ¶ 12). In mid-November, 1976, L. Bates Lea, head of the API Legal Task Force, called Ralph Copley, Getty's Chief Counsel, to state his belief that no conflict existed since the Westinghouse complaint made specific § 1 Sherman Act charges while the API work was a defense of the industry's structural posture. (Copley Rebuttal Aff.). In a December 7, 1976 letter to Ritchie, Rowe concurred with Lea's belief that no conflict existed, explaining that the API and Westinghouse matters dealt with completely different legal approaches to the application of antitrust principles, namely across-the-board legislative restructuring as opposed to case-by-case judicial enforcement. He added, however, that "to avoid any appearances of a possible future conflict," Kirkland should not advise API on uranium marketing and pricing matters during the pendency of the Westinghouse lawsuit without prior consent by both clients. (Rowe, Exh. C). Westinghouse has concluded that no conflict exists. (Pugliese, ¶ 5). And on December 1, 1976, the API's General Committee on Law discussed the conflict ·problem and reached a consensus that Kirkland's Washington office should continue to advise the API on the divestiture legislation. (Thurmond Re-

buttal Aff., ¶ 3). There is a sharp dispute between two members present at the meeting whether the Committee concluded that no conflict existed. Chairman Lea says yes (Lea, ¶ 9) and member Thurmond says no (Thurmond, ¶ 3). Kerr-McGee denies that the API committee has any power to issue a binding decision on this issue. (Cody Rebuttal Aff., ¶ 7).

There is one additional chronological strand of facts which runs alongside the history of Kirkland's API representation and which Kirkland deems significant to the oil companies' present charges of conflicting interests. Kirkland traces its representation of Westinghouse on the utility contracts litigation back to January, 1976 and describes its discovery requests in that case which were directed against the oil company movants. Kirkland asserts that during these contacts Kirkland attorneys consistently identified their Westinghouse affiliations and made numerous inquiries which put the companies on notice as to their investigation of a possible antitrust conspiracy in uranium pricing. Kirkland points to these encounters as evidence of its adversary stance with the oil companies and as evidence that no attorney-client relationship existed between Kirkland and the companies.

As noted earlier, Westinghouse is defending the utility contract action in the Eastern District of Virginia on the theory that unforeseen intervening circumstances regarding the price and supply of uranium rendered performance of its uranium supply contracts "commercially impracticable" under Section 2–615 of the Uniform Commercial Code. One of the intervening circumstances that Westinghouse has alleged in its answers to the complaints is an illegal agreement among uranium producers to manipulate the price and availability of uranium. *In Re Westinghouse Electric Corporation Uranium Contract Litigation,* 436 F.Supp. 990, 995 (Jud.Pan.Mult.Lit. 1977). The Judicial Panel recognized "that the allegations of a uranium price-fixing and market manipulation conspiracy in [the present case] and the actions in [Virginia]

involve common questions of fact . . ." *Id.*

In developing evidence for its defenses in the contract actions, Kirkland's Chicago attorneys working on the Westinghouse case embarked on a program to meet with uranium producers and others to gain knowledge of the uranium market. (Jentes, ¶ 10; Newton, ¶ 3; Sonda, ¶ 2). As part of this evidence-gathering effort, these Kirkland attorneys, mainly George Newton and James Sonda, contacted, deposed or sought discovery from agents of each of the three oil companies which have moved for Kirkland's disqualification. (Newton, ¶ 4).

On January 16, 1976, Sonda and Newton met for three hours with Mr. Peterson of the Getty legal staff and two Getty employees at company headquarters in Los Angeles. One of the employees was Dr. Siegfried Muessig, whom Kirkland believed had knowledge of the uranium market. At the outset of the meeting, Sonda and Newton identified themselves as Kirkland attorneys representing Westinghouse. According to their recollection, the discussion touched upon the March, 1973 meeting of uranium producers at Oak Brook, Illinois, which is identified in Westinghouse's present antitrust complaint as one phase of the uranium producers' conspiracy to demand and quote higher uranium prices. The participants also discussed statements by producers, including Getty, that uranium price increases were needed and probed the reasons behind the statements. (Newton, ¶ 5; Sonda, ¶ 3). Mr. Peterson, Getty's attorney, has a somewhat different recollection of the meeting. He understood that Kirkland's theory for its defense of commercial impracticability rested on a number of economic factors which contributed to uranium price increases, including the Arab oil embargo, Atomic Energy Commission policies, and governmental action of foreign uranium producing countries. He was told that Kirkland only wanted to discuss past and current projections of uranium supplies and prices, and heard no intimations that Kirkland saw conspiratorial conduct of uranium producers as a factor in the price increase. (Peterson Aff.).

On July 13, 1976, Kirkland served a deposition subpoena on Dale Cooper, a Getty employee who presented a paper at Oak Brook on the need for increased uranium prices. (Newton, ¶ 12). The subpoena requested Cooper to produce documents reflecting communication with other uranium producers on " . . . uranium prices or market conditions or the ability or inability of any producer to supply uranium to any customer." (*Id.*) At the deposition, during which Getty counsel were present, Sonda questioned Cooper at length about his participation in the Oak Brook meeting. (Sonda, ¶ 4). Cooper was directed not to answer any questions relating to the market analysis and price predictions made within his department since the late 1960's. (Newton Exh. 6). Although the parties had earlier agreed to limit the scope of the documents under subpoena, the documents eventually produced were unsatisfactory to Kirkland attorneys. (Newton, ¶ 13).

On August 30, 1976, Kirkland served a subpoena *duces tecum* on Dr. Muessig of Getty, again seeking to discover documents relating to price communication with other producers and to the Oak Brook meeting. (Newton, ¶ 14; Sonda, ¶ 5). Getty again objected to the subpoena. Discussions ensued between Getty and Kirkland attorneys. Sonda explained that efforts by the uranium producers to raise prices and restrict supply were highly relevant to Westinghouse's defense to the uranium contracts. (Sonda, ¶ 6). Getty attorneys speculated that Kirkland would use the information to prepare an antitrust suit against Getty, and they told Getty on September 19 that they would not comply unless they knew whether an antitrust action was in the offing. (Schuck, ¶ 5; Newton, ¶ 14). Getty's lead attorney, Carl Schuck, states that up to that time they had no express indication from Kirkland that Getty was the possible target of an antitrust action. (Schuck, ¶ 5). Coterminous with this perception, however, Sonda had no indications from Getty that Getty considered itself to be a client of Kirkland. (Sonda, ¶ 10). On September 23 or 24, Newton called Schuck

and told him that the activities of the foreign and domestic uranium producers were a necessary part of the Westinghouse litigation and that he could not assure Getty that no antitrust suit was contemplated. (Newton, ¶ 14; Schuck, ¶ 6). At that point, Schuck advised Getty to proceed on the assumption that it was a potential target. (Schuck, ¶ 7). Schuck eventually agreed to a limited response to the August 30 subpoena. (Sonda, ¶ 9). Schuck states that the antitrust potentiality materially affected his attitude of accommodation on Kirkland's discovery requests. (Schuck, ¶ 5).

The Cooper deposition was part of an intensive discovery effort by Kirkland between June, 1976 through the filing of the antitrust complaint to isolate the existence of an antitrust conspiracy among American uranium producers. During that time, 15 depositions of uranium producers were taken and tens of thousands of documents were examined. (Jentes, ¶ 10). By early September, 1976, the overall picture of the alleged conspiracy had taken fairly definite form with Kirkland attorneys. (Jentes, ¶ 11). As will appear below, Kerr-McGee employees were also the target of this pre-October discovery effort.

Kirkland's contacts with Kerr-McGee officials, as with Getty officials, began in January, 1976. At that time, Sonda asked Kerr-McGee's General Counsel, William Heimann, if Kirkland could interview two company executives, Corporation Chairman Dean McGee and Executive Vice-President George Cobb. (Sonda, ¶ 11). A January 12 letter from Sonda to Heimann stated that McGee's views would be helpful in illuminating " . . . price and supply expectations prior to 1973 . . . and the possibility of a uranium shortage in the next few years." (Sonda, Exh. 1). Dean McGee confirms that the discussions were to focus on past and future trends in the uranium industry and were connected with Westinghouse's defense of its uranium contracts. (McGee, ¶¶ 3, 4).

The meeting took place as scheduled on February 19, 1976 at Kerr-McGee headquarters in Oklahoma City. Present at the meeting were Sonda, Newton, Cobb, McGee, a Kerr-McGee in-house attorney, and Richard Zitting, President of Kerr-McGee Nuclear. (Newton, ¶ 10; Sonda, ¶ 12; McGee, ¶ 3). They recall that "among the topics discussed were the reasons behind the dramatic uranium price increase, Mr. McGee's prior testimony before the Joint Committee on Atomic Energy concerning meetings of foreign uranium producers, the lack of response by uranium producers to bid requests and the failure of foreign uranium producers to under-cut United States producers in sales to United States purchasers." (Sonda, ¶ 12; Newton, ¶ 10). While McGee does not dispute this account, he states that there was no suggestion that Kirkland was investigating the possibility that any uranium producers had conspired to restrain trade. (McGee, ¶ 5). He also perceived no hint that Westinghouse's interests were adverse to his company, and saw the meeting merely as a vehicle to provide background information to one of Kerr-McGee's customers (Westinghouse). (McGee, ¶ 6). On the other hand, Newton and Sonda similarly received no indication from the interviewees that they believed Kerr-McGee to be a client of Kirkland. (Sonda, ¶ 13; Newton, ¶ 18).

On July 26, 1967, Kirkland served a deposition subpoena on Mr. Zitting, President of Kerr-McGee Nuclear. (Newton, ¶ 15; Haubold, ¶ 7). The subpoena requested Kerr-McGee to produce documents relating to its communications with other uranium producers concerning "uranium prices or market conditions or to the supply by you of, or your inability to supply, uranium to any customer." (Haubold, ¶ 7). Three days later, one of Kerr-McGee's Chicago lawyers asked Newton for background information on Westinghouse's contracts litigation, and Newton responded by sending him copies of the complaints and answers in all 14 cases. (Newton, ¶ 15). On September 20–21 and October 10–11, Mr. Zitting attended the deposition and was questioned at length about price and supply communications among uranium producers. (Haubold, ¶ 7).

Unlike the contacts between Kirkland's Chicago attorneys and Kerr-McGee and Getty, the pre-October encounters with Gulf personnel were brief and unproductive. On February 12, 1976, after telephone conversations, Newton met in Denver with a Gulf attorney, Mr. Allen. Mr. Newton identified his Kirkland affiliation and discussed the current status of the Westinghouse litigation. (Newton, ¶ 9). He then asked to interview Gulf employees involved in its uranium activities, but Allen refused to allow any interviews. It does not appear that Kirkland made any further moves to investigate Gulf activities until October 26, 1976, when it subpoenaed documents on Gulf's participation in an Australian meeting of the alleged uranium "cartel." During the meeting Gulf allegedly laid plans to block Westinghouse's efforts to purchase low-cost Australian uranium. (Jentes, ¶¶ 12–14). Depositions of key Gulf officials did not begin until late December 1976, during the trial of one of the uranium contract cases in Pennsylvania state court. (Jentes, ¶¶ 12–13).

With this factual background in perspective, we now turn to an analysis of the legal theories presented by the parties. The oil companies contend that Kirkland was the attorney for not only the API, but also those members like Kerr-McGee, Getty and Gulf which openly opposed the divestiture legislation and confidentially consulted with Kirkland to provide data for the API report. They emphasize the promises of confidentiality and non-disclosure which permeated the data-collection process, and the relevance of the company discussions on their uranium holdings to the present Westinghouse litigation. They conclude that Kirkland's representation of Westinghouse in the present antitrust action against them violates Canons 4, 5 and 9 of the Code. of Professional Responsibility, which prohibit the actual or potential disclosure of client confidences, ban the representation of adverse interests in substantially related litigation, and require attorneys to avoid the appearance of impropriety.

Kirkland's basic defense is that its only attorney-client relationships have been with Westinghouse and API, not the member oil companies. Kirkland stresses the absence of any explicit evidence documenting the existence of such a relationship with Getty, Gulf or Kerr-McGee, and points out that its course of dealing with those corporations during its discovery efforts in the uranium contracts litigation put those companies on notice of its attempts to support Westinghouse's antitrust defenses in the Virginia lawsuits.

We find that our decision on the oil companies' disqualification motions turns upon the existence of an attorney-client relationship between them and Kirkland. Because the duties of loyalty and confidentiality adhere to the fiduciary relationship between an attorney and his client, one who seeks to disqualify opposing counsel based on a violation of those duties must show that such a relationship exists or has existed with him during a current or earlier representation. *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 608 (8th Cir. 1977); *In Re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 90 (5th Cir. 1976); *American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1971).

An attorney-client relationship is one of agency to which the general rules of agency apply. *Brinkley v. Farmers Elevator Mut. Ins. Co.*, 485 F.2d 1283, 1286 (10th Cir. 1973); Restatement 2d Agency § 1, comment e (1958); 7 C.J.S. Attorney and Client § 67. The relationship arises only when the parties have given their consent, either express or implied, to its formation. *Committee on Professional Ethics & Grievances v. Johnson*, 447 F.2d 169, 174 (3d Cir. 1971). The client must manifest his authorization that the attorney act on his behalf, and the attorney must indicate his acceptance of the power to act on the client's account. Restatement 2d Agency, § 15. These manifestations may be made by words, either written or oral, or may be inferred from other conduct, including acquiescence.

The movants concede that explicit evidence of their alleged attorney-client rela-

tionship with Kirkland is lacking. The affidavits are devoid of any written or oral request by any oil company representative that Kirkland act as its attorney, of any written or oral acceptance of such representation by Kirkland, and of any direct payment of legal fees by the movants to Kirkland. All the contemporaneous documents prepared in connection with the API report state that Kirkland was retained by API, and make no reference to API members as Kirkland's clients. Kirkland sent its legal bills to the API, and was compensated only by the API.[1] (Rowe, ¶ 4).

Recognizing the absence of express manifestation, the oil companies fall back on the accepted principle that the relation of attorney and client may be implied from the conduct of the parties. *E. F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 388 (S.D.Tex. 1969). In the typical case, such conduct includes the preparation of a legally-binding document like a contract or a will, or the attorney's appearance in a judicial or quasi-judicial proceeding. Again, these indicia are absent here. We therefore refine our inquiry to a search for evidence of what we believe are three fundamental characteristics of an agency relationship. We caution, however, that because the overarching requirement is the existence of a consensual agreement between the parties, these characteristics are to be weighed as circumstantial evidence that an agreement does or does not exist, and not as conclusive determinants of an agency relationship.

■ The first characteristic indicative of an agency relationship is that an agent has the power to affect the legal relations of the principal and others. Restatement 2d of Agency, § 12. Here Kirkland's express authority was to prepare a report to be used as source material for congressional testimony and public advocacy. The firm's involvement was that of an expert consultant and researcher. Kirkland was not empowered to effectuate any legally-binding

documents or to prepare for litigation on behalf of either the API or the oil companies. Hence, the absence of typical legal powers undermines the existence of an attorney-client relationship with both entities. It is therefore not helpful in inferring the existence of a consensual agreement between Kirkland and the oil companies.

■ The second characteristic is that an agent is a fiduciary who works on behalf of his principal and primarily for his benefit. Restatement 2d of Agency, §§ 1, 13. The understanding that one is to act primarily for the benefit of another is often the determinative feature in distinguishing the agency relation from other relations. *Id.*, § 13 comment b. There are three entities claiming the status of principals here—API, Westinghouse, and the oil companies. Kirkland says it worked only on behalf of the first two, and the oil companies say Kirkland worked for all three. It is fairly clear that the API report inured primarily to the benefit of the oil company members. Only those companies, not the API, had property interests or land holdings in alternative energy resources which were financially threatened by divestiture plans. However, if we view the situation in terms of working relationships rather than ultimate benefits, the result is less certain. The API is an independent corporate entity with responsibilities for a number of substantive programs. It is not a mere mouthpiece for its members' interests. Its anti-divestiture campaign was an industry-wide cooperative effort in which the API had substantial leadership and coordination responsibilities. Kirkland arranged the corporate interviews and the questionnaire survey through API's offices, and API communications to its members were explicit in describing Kirkland as "independent special counsel for API." On the other hand, these actions and communications are not necessarily inconsistent with a claim of represen-

---

1. The oil companies paid dues to the API which were then used indirectly to pay Kirkland's legal fees, but these dues are hardly evidence of an attorney-client relationship with Kirkland, since this manifestation by the claimed principal was directed toward a third party, not the purported agent, and therefore is irrelevant to the existence of a consensual agreement between them.

tation by the oil companies, since their interests coincide with those of the API, and an attorney can work for multiple clients when their interests are harmonious.

Another series of events must be factored into the question of whether Kirkland worked for and on behalf of the oil companies. While Kirkland's Washington office was preparing the API report, its Chicago attorneys were seeking discovery against those companies to bolster Westinghouse's defenses to the uranium contracts lawsuits. In each contact with top corporate executives or company counsel, Kirkland attorneys told the oil companies they represented Westinghouse in that litigation. In the case of Getty and Gulf, those discovery forays were viewed with circumspection, limited accommodation, or even outright resistance. These reactions support the view that the Kirkland firm, when its branch offices are considered as a unitary whole, stood in a quasi-adversary posture *vis-a-vis* the oil companies. Even Kerr-McGee's discovery responses, although they were more cooperative than Gulf's or Getty's, were seen by the company as background information for one of its uranium customers, not as fuel for Kirkland to use in furthering Kerr-McGee's interests. The oil companies attempt to discount this whole series of discovery encounters on the grounds that they saw no adversity in Westinghouse's discovery requests, did not have reason to suspect that Westinghouse was investigating an antitrust conspiracy among uranium producers, and were not told by Kirkland that they were potential defendants in a Westinghouse lawsuit. However, we see this evidence not as an attempt to prove the oil companies' awareness of and acquiescence in Kirkland's conflicting position on competition in the uranium industry, but as tending to prove that Kirkland was not acting on behalf of any discrete or particularized oil company interests, i. e. those of Getty, Gulf or Kerr-McGee.

The final evidence to be considered in conjunction with the second characteristic of agency relationships are the confidentiality agreements which accompanied Kirkland's data-gathering activities. The oil companies rely heavily on these agreements. They contend that when they submitted their top executives to in-depth interviews by Kirkland on uranium matters under repeated assurances of confidentiality, and submitted confidential financial data on the questionnaire with the same assurances, an attorney-client relationship was created between them and Kirkland. Since corporations do not normally submit confidential information to persons who intend to work against them, it is possible to infer that the transfer of information and a promise of confidentiality is evidence that an agency relationship exists between the communicants. But the inference is a tenuous one. The agency relationship is founded on the manifest agreement of the parties, not on the content of the information disclosed between them. The fiduciary duties of confidentiality, loyalty and obedience are consequences of a properly formed relationship, not the origin of one. The danger of allowing the tail to wag the dog is real. Nevertheless, we see some probative value in confidentiality agreements, if they tend to show that an attorney-client relationship existed. The problem here is that the confidentiality agreements were not designed to protect the oil companies' information from disclosure in legal or judicial settings. The oil companies did not repose confidence in Kirkland in order to more fully prepare a legal defense or to receive better legal services. Instead, the agreements were designed to protect the oil companies' proprietary information from disclosure to other business competitors who were also members of API. Kirkland acted as a neutral clearinghouse for the aggregation of commercial assets. The agreement prohibited disclosure "to any other company, or even to API," because API's possession of the information could be transmitted to competitors through their representatives in API's organizational hierarchy. Therefore, the confidentiality agreements are more probative of the companies' concern for the preservation of commercial advantage than of their status as clients of Kirkland.

In sum, as far as the second criteria for an implied agency relationship is concerned, the evidence is conflicting and ambiguous. The report clearly benefitted the oil companies, but Kirkland's working relationships were defined largely by the API alone. Kirkland's discovery efforts on behalf of Westinghouse undermine its alleged status as the companies' attorney. And the confidentiality requirements accompanying the API study are consistent with a desire for protection of commercial secrets as well as with the possible existence of an attorney-client relationship.

With these inconclusive indicators in mind, we turn to the third characteristic of an agency relationship, that is, the fact that a principal has the right to control the conduct of the agent. Restatement 2d of Agency, § 14. An agent's continuous subjection to the will of the principal is a critical element of agency agreements. *Id.*, § 1, comment b. In the case of attorneys, although the principal may have agreed to allow the attorney an unlimited discretion, he nevertheless has the power to give lawful directions which the attorney is under a duty to obey. *Id.*, § 14, comment b.

The evidence in the present case demonstrates that the right of control over Kirkland's work rested almost entirely with the API, not the oil companies. Although Kirkland's status as an "independent expert counsel" weakened its submission to external controls, it still received all its marching orders and directions from the API Legal Task Force. The idea of a Kirkland study originated with L. Bates Lea, head of the Task Force. The parameters of Kirkland's work, including its scope, topic, and source material, were defined by Stark Ritchie, who was Lea's assistant as well as API's General Counsel. (Ritchie Exh. 2). Most importantly, the confidentiality requirements were initially imposed by Ritchie, not by the oil companies. (*Id.*). Ritchie also arranged for interviews with a cross-section of industry personnel, and prepared the memorandum which accompanied the questionnaire to 59 of API's corporate members. In addition, the API published and distrib-

uted the final report. As against this picture of API control, the power of the oil companies to influence the shape of the API report is meager. The companies were sent the preliminary drafts of the report, and were invited to submit their comments and written suggestions. Those comments were not to be sent to Kirkland directly, but were referred through James A. Atkin, who was the Project Director of the API Committee on Industrial Organization. (Hefler Exh. 10, 4). In addition, in submitting its completed questionnaire, Gulf reiterated Ritchie's earlier directive on confidentiality.

Viewed in its totality, we believe the evidence shows that no attorney-client relationship has existed between Kirkland and the oil companies. Explicit indications of an agreement to act as attorney and client are lacking, and Kirkland's preparation of a legislative report for a large trade association carries few implied indicia of legal representation for the contributing members. When the three essential elements of an agency relationship are applied to the present facts, they are either not helpful at all, ambiguous, or contrary to the companies' positions. Executives of the oil companies repeatedly assert their present belief that an attorney-client relationship existed, but "agency is a legal concept which depends on the manifest conduct of the parties, not on their intentions or beliefs as to what they have done." *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 523 F.2d 527, 537 (2d Cir. 1975). The contemporaneous statements of the parties, as reflected in the letters and memoranda in the record, all lead to the conclusion that Kirkland did not represent the oil companies.

As noted earlier, the absence of an attorney-client relationship is typically the death-knell of a motion to disqualify. We agree, at least insofar as any violations of Canons 4 and 5 are concerned. Those Canons presume and preserve the duties of confidentiality and loyalty which adhere in the attorney-client relationship. However, the defendants have also invoked the broad

injunction of Canon 9 against the "appearance of professional impropriety." That Canon covers the entire spectrum of an attorney's professional life and may support a motion to disqualify even without proof of actual wrongdoing. *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 609 (8th Cir. 1977).

■ We believe that there is some evidence of a Canon 9 violation, even without proof of a formal attorney-client relationship. The claim of such a relationship is more than colorable, and the conflicting positions of Kirkland on competition in the uranium industry are clear. In addition, the transmission by the oil companies of confidential information on their uranium industries and assets has given rise to justifiable fears that their disclosures will return to haunt them in the present litigation. The acquired information appears to be closely related to the subject matter of the Westinghouse complaint. An attorney should not place himself in a position where he will or might be tempted to take advantage of information derived from confidential interviews. *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972). In addition, the communications between Kirkland, the API and the oil companies after October 15 show that even Kirkland recognized the questionable character of its conduct. Conscious of the need to preserve public confidence in the legal profession, we are reluctant to exonerate Kirkland for what appears to be an error in professional judgment.

■ Nevertheless, we are equally reluctant to take the extreme step of disqualification to remedy a Canon 9 violation by itself, especially in a case of the present complexity and magnitude. Canon 9, unlike Canons 1–8, is primarily aspirational in character. Its language is all-inclusive, perfectionist, and unmerciful. But at the same time, its command is less comprehensively supported by the disciplinary rules which the bar has drafted to implement and give teeth to the Canons. While courts have disqualified attorneys under the appearance of impropriety doctrine even without evidence of actual wrongdoing, their decisions have typically rested on one of these disciplinary rules. *See, e. g., General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974). Kirkland's apparent impropriety does not fit within any of Canon 9's disciplinary rules. Instead, it falls in the twilight zone of ethical transgressions, where blackletter rules blur into grayish hues. In these situations, a mechanical application of Canon 9 is to be avoided, lest the harm to the client and the judicial system outweigh the value of the presumed benefits. *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1293, 1295 (2d Cir. 1975). The unnecessary disqualification of an attorney under an overly broad application of Canon 9 may unfairly deny a litigant counsel of his choice, thereby contributing to public suspicion of the bar and the judiciary. *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976). In an attempt to give objective and pragmatic content to Canon 9, the following test has been offered: an attorney should be disqualified under Canon 9 only when "there is a reasonable possibility of improper professional conduct" and "the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." *Id.* at 813, n.12.

■ The crux of the oil companies' charges of impropriety rest upon the receipt of confidential information by attorneys in the Washington branch of the Kirkland firm who prepared the API report and their presumed disclosure of those confidences to attorneys in Kirkland's Chicago office who were handling the Westinghouse litigation. In cases where courts have found a disclosure of client information to one member of a law firm, such knowledge has traditionally been imputed to all members of his firm. *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir. 1976). However, recent decisions have occasionally rejected this rigid approach, in recognition of the changing realities of modern legal practice. As Judge Weinstein aptly noted in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors*

*Corp.,* 370 F.Supp. 581, 588 (S.D.N.Y.1973), *aff'd* 518 F.2d 751 (2d Cir. 1975):

"Since the largest firms represent the largest corporations with interests in all sectors of the economy, it is almost impossible to have an important client or its subsidiary avoid some kind of legal relationship with another client at some time. *Cf.* E. O. Smigel, The Wall Street Lawyer 234 (1964). 'Where a firm represents concurrently conflicting interests, the practice is sometimes followed of "splitting up" the firm into separate teams of lawyers, each of which represents one of the antagonistic clients.' (Citations omitted) The fact that attorneys within the firm are effectively insulated from exposure to the confidences of other clients where necessary demonstrates the inappropriateness of an invariable mechanical imputation of knowledge."

In *City of Cleveland v. Cleveland Electric Illuminating Co.,* 440 F.Supp. 193, 211 (N.D. Ohio 1977), the court followed Judge Weinstein's departure from the traditional rule, explaining that:

Imputing to an attorney in the private practice all confidential information obtained, or presumed to have been obtained, by other members of his law firm may severely limit the scope of the private attorney's future career and the effective operation of his firm, as well as the individual's right to legal counsel of choice. The . . . rule in the private practice of law should therefore limit the imputation of confidential disclosures, actual or presumed, to only those lawyers practicing in the attorney's area of concentration. Absent direct proof to the contrary, the attorney would not be deemed to have shared confidential information relating to matters and services exclusively within the sphere of representation of another department or section of his firm. This . . . rule is more acutely dramatized in the large, departmentalized law firm characteristically more prevalent in an era of evolving legal specialization.

Kirkland is one of the largest law firms in Chicago, with over 130 partners and associates. Its Washington office adds another 40 members, making it one of the larger firms in the country. The API and Westinghouse assignments were handled by different sets of Kirkland attorneys. They worked at separate locations, with Chicago attorneys responsible for the Westinghouse litigation and Washington attorneys working on the API report. No reported communications passed between the two offices about the respective work until October 15, 1976, when the Westinghouse complaint first came into the public eye. The API attorneys affirm that they never disclosed any API data to the Westinghouse attorneys either before or after that date. The Chicago attorneys confirm they received none of the data. These affidavits are sufficient to support a conclusion that no disclosure of confidences occurred. *Silver Chrysler, supra,* 518 F.2d at 757. In addition, Clark and Rowe took the additional precaution of returning the data sheets for the API questionnaire to the oil companies. And Stark Ritchie, their supervisor, has received no indications that his instructions on confidentiality have been violated. (Ritchie, ¶ 7). Finally, a large amount of the information compiled for the API was publicly available. In view of this rigid segregation between the Westinghouse and API attorneys, the geographical separation of their offices, and the absence of any hint of actual disclosure, the possibility of improper professional conduct is fairly remote.

We also find that the residue of suspicion which remains from Kirkland's dual engagement does not outweigh the social interests which will be served by their continued representation of Westinghouse in the current litigation. For the past three years, Kirkland has been Westinghouse's lead counsel in the uranium contracts litigation, which is comprised of some 17 lawsuits. Because the potential liability for Westinghouse in these actions extends into the billions of dollars, their outcome is of vital importance to Westinghouse's very corporate existence as well as its shareholders and its customers. Under the guidance

and direction of Kirkland, literally hundreds of depositions have been taken. (Pugliese, ¶ 6). The trial of the contracts cases has already consumed six months. One of the major defenses of Westinghouse to these suits involves an alleged antitrust conspiracy between the uranium producers, which is the subject of the case before us. The connecting lines between the two strands of litigation are multiple and direct; thus, Kirkland's experience in the contracts litigation will be invaluable to the efficient prosecution of the antitrust phase of the dispute.

The ramifications of the Westinghouse litigation are not confined to its own private interests. The allegations of the complaint paint a picture of uranium price-fixing and supply restrictions which spell higher costs for utilities and ultimately higher charges for customers as well. As an example of the national impact of Westinghouse's complaint we take judicial notice of three similar antitrust actions by the Tennessee Valley Authority against many of the same defendants as are named here. In addition, there are a number of other uranium contracts in litigation elsewhere in the country. Our impression of this case, and we think it is objectively verifiable, is that it involves an incredibly complex factual situation which implicates the nationwide and multinational connections of virtually the entire uranium industry. The complaint itself names 29 uranium producers, and consists of some 46 pages of allegations describing a course of conduct spanning some four years and four continents. To force Kirkland to give up the reins to an inexperienced driver at this stage of the journey will cause inevitable delay in the progress of the litigation, and may well compromise the just resolution of a vital public issue. *See W. T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976).

In sum, when we piece together all the competing arguments on the oil companies' motions to disqualify, we come away with the firm conviction that disqualification of Kirkland is a drastic, unjustified, and inequitable resolution of a minor ethical grievance. Accordingly, the motions of Getty, Gulf and Kerr-McGee to disqualify Kirkland are denied. Because twelve other defendants (Anaconda, Atlas, Denison Canada, Denison U. S., Federal Resources, Homestake, Phelps Dodge, Reserve, Rio Algom U. S., United Nuclear, Utah International and Western Nuclear) have tied their motions to disqualify to the success of the oil companies', and they raise no substantial ethical charges on their own, their motions are likewise denied.

We now turn to defendant Noranda's motion to disqualify Kirkland. Although Noranda's motion resembles those of the other defendants by charging Kirkland with a conflict of interest in its representation of current and past clients, it contains two distinguishing features. First there is no doubt that Kirkland had an attorney-client relationship with Noranda from 1965 to 1967. Second, Kirkland's Chicago office has handled both the Noranda and Westinghouse matters, and some of the same attorneys have worked for both clients.

In its motion, Noranda makes the following claims. In the course of its previous representation, Kirkland acquired intimate knowledge of Noranda's corporate organization, officers, marketing methods, business philosophy and its present and future contracts with the United States. One avenue of knowledge involved Noranda's relationships with its subsidiaries and associated companies. Two of those companies are Noranda Sales Corporation, Ltd. (Noranda Sales) and Kerr-Addison Mines Limited (Kerr-Addison). Noranda's relationship with these companies has now became a central and essential issue raised by the Westinghouse complaint, whether viewed in terms of jurisdiction, venue, or the merits. Paragraphs 2 and 19 of the complaint attempt to establish jurisdiction and venue over Noranda, a Canadian corporation, through its transaction of business in Illinois "either directly or through its sales agent" Noranda Sales. In addition, paragraphs 19 and 39 of the complaint attempt to connect Noranda to the alleged uranium cartel by alleging that Noranda "holds the controlling interest" in Kerr-Addison, that

Kerr-Addison and its wholly-owned subsidiary (Kerramadex) are engaged in uranium exploration and development in the United States, and that Noranda would benefit from those companies' participation in the alleged cartel. Because Kirkland has had access to confidential information on Noranda's intercorporate connections, and that information is highly relevant to proving certain allegations of the Westinghouse complaint, Kirkland must be disqualified to prevent the disclosure of client confidences and the use of those confidences against Noranda in the present action.

■ In our earlier opinion in *Cannon v. U. S. Acoustics Corp.*, 398 F.Supp. 209, 221–224 (N.D.Ill.1975), aff'd. *in relevant part*, 532 F.2d 1118 (7th Cir. 1976), we fully reviewed the legal principles applicable to conflicts of interest between an attorney's current and prior clients. Relying on a consistent line of judicial opinions, we adopted the "substantial relationship" test for judging the nexus between conflicting representations. We noted that the test is a measure of the quantum of evidence required for proof of an ethical violation. 398 F.Supp. at 223. Once this evidentiary standard is satisfied, an inference is created that the attorney has acquired confidential information which he might use, or might be tempted to use, to his present client's advantage or his former client's disadvantage in the present case. To protect and encourage the free flow of information between attorney and client, the attorney in such cases must be disqualified.

Unfortunately, the case law offers no clear guides as to what constitutes a substantial relationship. In most cases in which disqualification has been ordered, the lines between the two lawsuits has been "patently clear" and usually involved the same documents or the same litigation. *Silver Chrysler, supra*, 518 F.2d at 754; *United States v. Standard Oil Co.*, 136 F.Supp. 345, 355–56 (S.D.N.Y.1955). In those cases where the connections were not clearly apparent, courts have adopted varying standards. In *United States v. Standard Oil Company, supra*, 136 F.Supp. at 356–59, the

court focused on the scope and character of the duties of the challenged attorney during his former tenure as a government employee to determine whether he had received knowledge of the subject matter of the current lawsuit. In *Fleischer v. A. A. P., Inc.*, 163 F.Supp. 548 (S.D.N.Y.1958), the court employed a complex analysis of the contractual rights of the parties under prior licensing agreements and then asked whether those rights could have any present impact upon the interpretation of the contract which was currently in litigation. Neither of these decisions is particularly helpful here.

Our earlier *Cannon* opinion is more pertinent and instructive. Defendant U. S. Acoustics Corporation (Acoustics) sought to disqualify two attorneys who had rendered legal services for the corporation in the past. In 1970 Giambalvo had drafted a pre-organization subscription agreement for Perlite, a wholly-owned subsidiary of Acoustics. In 1974, his firm represented the plaintiff in filing a derivative stockholder's action against Acoustics. The other attorney, Cannon, was sole legal counsel for Acoustics from 1968 to 1972, and sole legal counsel for Perlite between 1970 and 1973, and had performed a multitude of professional services for all of the defendants during the years 1961–1973. In 1974, he was named as a party plaintiff in the derivative action. We denied the motion to disqualify Giambalvo, and granted the motion to disqualify Cannon.

In reaching these divergent outcomes, we noted the differing quantitative and qualitative contacts of each attorney with Acoustics. Giambalvo's relationship with the corporation was "not protracted," lasting only two months. His only reported task involved the drafting of the subscription agreement. Acoustics argued that in connection with this work, Giambalvo received confidential information on internal corporate affairs, including data on finances, taxes, stock and management. And it contended that one paragraph of the agreement authorized a stock issuance which was being challenged in the pending

stockholder complaint. In response, Giambalvo asserted that the disputed paragraph was actually drafted and submitted to him by Acoustics' top executive, and that he had never received any data or information regarding Acoustics' internal affairs. His oral communications were limited to the corporate purposes and structure of Perlite, the Acoustics subsidiary.

Cannon's activities on behalf of Acoustics were much more pervasive. He performed a multitude of legal services for Acoustics over a 12-year period. We gave strong weight to the fact that this time period encompassed the time span in which the wrongs described in the pending complaint allegedly occurred. We noted that Cannon as corporate attorney prepared many agreements which Cannon as plaintiff then sought to rescind. He had personal conferences with corporate executives, gave legal opinions, and reviewed all material mailed to shareholders. We concluded "that Cannon must have had access to information and materials which could be used adversely against his former clients." 398 F.Supp. at 227.

From a comparison of these two attorneys who shifted from corporate counsel to corporate adversary, we discern that disqualification is more likely if the attorney has a regular and protracted association with the corporation, is currently challenging corporate actions in which he was a participant, and received confidential information about internal corporate affairs which bear on the present controversy.

When we examine the record in the present case, we find a situation falling somewhere in between Giambalvo and Cannon. Kirkland's representation of Noranda ranged from July, 1965 until August, 1967 (Cork, ¶ 4). In 1965, Kirkland represented Noranda in the formation of a joint venture with Central Farmers Fertilizer Company (CFF), a domestic corporation centered in Chicago, Illinois. By that agreement, Noranda and CFF formed a Canadian corporation to mine potash in Canada. (Cork, ¶ 14; Johnson, ¶ 4). Noranda points to only one connection between the CFF deal and the Westinghouse complaint. Mr. D. E. G. Schmitt is an executive of both CFF and Noranda. In pretrial discovery on jurisdiction and venue issues, Mr. Schmitt has been scheduled for a deposition by Westinghouse. Of all the defendants, only Noranda was targeted for depositions of more than one person, namely Mr. Schmitt. Noranda concludes that Kirkland took advantage of information gleaned from its prior representation to discern the importance of Schmitt's deposition. In our view, Noranda's chain of logic is tenuous, to say the least. Even Noranda admits that Kirkland has alternate public sources of information for Schmitt's identity. Given the wholly different character of a potash joint venture and a uranium price-fixing conspiracy, the CFF matters contribute virtually nothing to the presence of a substantial relationship.

The more serious allegations center around Noranda's abortive effort in 1967 to acquire control of Essex Wire Corporation, a U. S. corporation, by means of a negotiated exchange offer. Working in conjunction with Noranda's general counsel in Toronto, Canada, Kirkland advised Noranda on the impact of U. S. anti-trust, corporation, securities and tax laws on the proposed exchange offer. (Cork, ¶¶ 6–8; Johnson, ¶¶ 4–5). The mechanics of the exchange required the formation of a Delaware subsidiary (Noranda, Inc.) of the Canadian corporation (Noranda Mines Ltd.). (Cork, ¶ 16; Johnson, ¶ 5). The actual exchange then involved the offering of a package of securities and cash by the Noranda subsidiary to Essex shareholders, in return for Essex stock. (Cork, ¶ 8; Johnson, ¶ 5). Kirkland carried out the ministerial work of organizing the American subsidiary, which included the naming of three Kirkland attorneys as incorporators, the holding of the first meeting, and the election of directors. (Cork, ¶ 16; Johnson, ¶ 6). Kirkland's actual degree of participation in the decision to utilize an American subsidiary is somewhat unclear. Noranda's Vice-President confirms the conclusory assertion that Kirkland advised the company on the "preferred corporate structures" for the transaction.

(Cork, ¶ 8). The Kirkland attorney who worked on the matter recalls that the decision was made by Noranda and its general counsel at the outset, and that Kirkland proffered no advice on the business or legal advantages of that decision. (Johnson, ¶ 6).

In addition to establishing the American subsidiary and constructing the securities package, Kirkland advised Noranda of the disclosures required under the securities laws, the tax consequences of the exchange, and the antitrust problems. According to Kirkland, the antitrust issues were substantial since both Noranda and Essex sold copper wire and cable in the U. S. and Noranda was to become the supplier of Essex's considerable copper requirements. (Johnson, ¶ 5; Bartlit, ¶ 4). Three Kirkland attorneys studied the antitrust issues, which culminated in the preparation of a "Fact Book" which analyzed the competitive impact of the acquisition. (Bartlit, ¶¶ 4–6; Cork, ¶ 7).

Because both the Noranda and Westinghouse representations involve antitrust questions, the scope of Kirkland's antitrust inquiry for Noranda is critical to determining whether a substantial relationship exists. Noranda quotes from a Kirkland memorandum which called for:

"A rather comprehensive examination of the records and file of Noranda (and Canadian Wire and Cable), including directors' and executive committee meeting minutes, long range planning studies and reports, and all communications among key personnel. This search should undoubtedly extend beyond any references to the immediate transaction and cover as well the entire area of efforts or plans to invest or operate in the United States." (Cork, ¶ 7).

Noranda states that in fulfilling this task, Kirkland gained access to detailed information concerning its corporate organization, its officers, sales contracts, marketing methods, business philosophy, customer lists, sales data, business contacts with the United States, its relationship with Noranda Sales and Kerr-Addison, and its future plans for U.S. activities. (Cork, ¶¶ 5, 8–10). Based on these facts, Noranda concludes

that Kirkland inquired into "all aspects of Noranda's business activities."

In response to this charge of corporate omniscience, Kirkland's attorney states that the antitrust investigation was limited to copper and copper products "because those were the only areas of actual or potential competition between Essex and Noranda." He recalls no reference to uranium and can find no indication in his present files that the investigation probed Noranda's amenability to the jurisdiction of U.S. courts. (Bartlit, ¶¶ 7–9). Kirkland justifiably pleads ignorance as to the exact scope of its investigation, since the fact book and "all of the items of material personal to Noranda" were returned to the corporation on August 1, 1967 after the tender offer was aborted. (Noranda Exh. A). In addition, Kirkland simultaneously destroyed the longhand notes of its attorneys who viewed corporate data. (*Id.*) Kirkland's files are devoid of the antitrust documents, and Noranda has refused to allow Kirkland to inspect the fact book in its possession. (Bartlit, ¶ 8; Edelman, ¶¶ 2–3).

The final facts to be figured into the substantial relationship test cover Kirkland's activities from 1967 to the present. The firm has not represented Noranda on any matter since 1967. On October 15, 1976 Kirkland filed a complaint on behalf of Westinghouse against Noranda and 28 other corporations, alleging conspiratorial conduct in the pricing and marketing of uranium. Noranda's connection with uranium is based on the sales activities of Noranda Sales and the uranium business of Kerr-Addison. The complaint alleges a uranium price-fixing conspiracy which did not begin until 1972, five years after the Noranda representation ended.

Based on this factual situation, we see no substantial relationship between the Noranda and Westinghouse representations. The subject matter and temporal span of the two engagements are wholly different. The Essex Wire Corporation has no place in the present litigation. In the prototypical case for disqualification, Kirkland's present representation would involve an antitrust

suit against Noranda and others for monopolization of the copper industry. Instead the Westinghouse complaint concerns a completely different industry and a completely different time. Failing the subject matter relatedness test, Noranda falls back on the argument that Kirkland may have acquired internal corporate information which is relevant to the issues in the Westinghouse complaint. Noranda emphasizes the all-inclusive scope of the antitrust inquiry conducted by Kirkland in the Essex matter, and concludes that the data gleaned during the inquiry is directly applicable to current issues.

Thus the only real question is whether Kirkland's prior antitrust investigation for Noranda makes it reasonable to say that Kirkland might have acquired information related to the issues raised in the Westinghouse lawsuit. The question is not an easy one, but we conclude that the connecting lines are too thin to warrant disqualification. We believe it is speculative and wholly unrealistic for Noranda to charge Kirkland with omniscience about its corporate organization based upon a 10-year old working relationship, and then carry that imputation of knowledge to a wholly unrelated representation. Several factors contribute to this conclusion. Kirkland did not have a protracted or regular association with Noranda. It was not the corporation's general counsel. Its Essex representation was specialized and focused. Unlike the disqualified attorney in *Cannon*, Kirkland had no continuing symbiotic relationship with the corporation. It was employed for a specific purpose and then dropped. It is possible that some of the data perused in 1967 might shed a pale light on Noranda's connection with its associated companies. But the information was examined in the context of market concentration in the copper industry, not market conspiracy in the uranium industry. And the data on Noranda's sales and business contacts with the United States is likely to be obsolete in 1976 or even in 1972, when the conspiracy allegedly began. No one in the firm has a present recollection of Noranda's intercorporate connections, and a draftsman of the West-

inghouse complaint states that all information used in preparing the complaint was taken from public sources. (Goold, ¶¶ 2–3; Bartlit, ¶ 8; Johnson, ¶ 6). All pertinent data collected during the antitrust inquiry was either returned to Noranda or destroyed. The contemporaneous documents evidencing those actions convincingly demonstrate that Kirkland's involvement was abruptly and thoroughly terminated when its limited task was completed. In sum, we are left with the bold speculation that some unspecified residue or fallout from a long-closed file continues to haunt the hallways of Kirkland's offices. Such a speculative connection goes far beyond any of the connections in reported cases in which disqualification of an attorney was ordered. We agree with the sentiments of the court on *Bonus Oil Co. v. American Petrofine Co.*, 1975 Trade Cas. ¶ 60,315 (D.Neb. 1975):

> "Where the issues dealt with in a prior representation are substantially related to issues raised in the representation in question, the court need not and should not require proof of actual exposure to relevant client confidences; but in cases like this where the issues are not so related, the party seeking disqualification must show that there was actual exposure to material which a reasonable man would say could be relevant to the present litigation."

Since Noranda has not satisfied this burden, its motion to disqualify Kirkland is denied.

The final motion to disqualify pending before us raises issues similar to those in the Noranda motion, but in a completely different context. The motion, which is presented by defendant Gulf Oil Corporation, is not directed at removing counsel for plaintiff, its natural adversary. Rather it seeks to eliminate counsel for one of Gulf's co-defendants, United Nuclear. The challenged firm is Bigbee, Stephenson, Carpenter & Crout ("Bigbee"). From 1971 until 1976, Bigbee provided legal services to Gulf in connection with its uranium properties in New Mexico.

Gulf charges that on behalf of United Nuclear, Bigbee has taken a position adverse to Gulf in the present action. In addition, Gulf claims that Bigbee's prior work for Gulf allowed it to acquire confidential information that has a substantial bearing on the present litigation and may even require Gulf to call Bigbee attorneys as witnesses against United Nuclear. Bigbee has defended the Gulf attack on all fronts, contending that there is no adversity between the two co-defendants, and no substantial relationship between its prior Gulf work and the Westinghouse action. Furthermore, Bigbee counterattacks with the claim that Gulf has repeatedly consented to its representation of United Nuclear, even against Gulf. We find that although the present interests of Gulf and United Nuclear can be considered adverse for present purposes, there is no substantial relationship between Bigbee's two engagements. With that fundamental prerequisite to disqualification lacking, it is unnecessary to resolve the issue of consent.

Gulf asserts that the presence of antagonistic interests is apparent from United Nuclear's answer to the Westinghouse complaint. Paragraph 4 of the complaint contains general introductory statements describing Westinghouse's corporate identity and the scope of its business. It concludes with the statement that Westinghouse has bought and sold uranium "until and after the commencement of the illegal acts complained of herein." Westinghouse later describes those illegal acts in the twenty pages of its complaint between paragraphs 35 and 54. In its answer to paragraph 4, United Nuclear admits the allegations describing Westinghouse, but denies any participation in the illegal acts described in the last sentence of the paragraph. United Nuclear then goes on to admit that it has obtained information which discloses that Gulf has "engaged in certain activities designed to unlawfully affect uranium market conditions, which activities may be contemplated by the allegations of 'illegal acts' . . . ." in paragraph 4. We agree with Gulf that the alignment of the parties is not the exclusive criterion for judging adverse interests, and that United Nuclear's answer creates adversity by pointing an accusatory finger at Gulf while exonerating itself.

Gulf also has the burden of showing that Bigbee's prior representation of Gulf is substantially related to its adverse representation of United Nuclear in the present litigation, so that there is a reasonable possibility of the transmission of relevant confidential information. Gulf's chain of logic is as follows. From 1971 until 1976, Bigbee represented Gulf in the development of uranium reserves at its Mt. Taylor Project in New Mexico. Of Gulf's proven domestic uranium reserves, its Mt. Taylor properties are the "most significant." As of March, 1977, Gulf has not mined or milled uranium from this area. Gulf purchased some of the property from, or holds joint interests in the property with, a corporation named Kerramadex. In representing Gulf, Bigbee became privy to Gulf's reasons for the delayed production of uranium at Mt. Taylor, and to Gulf's relationship with Kerramadex. In its present complaint against Gulf, Westinghouse has alleged that Gulf has conspired with other defendants to curtail the supply of uranium, and has alleged that one of Gulf's co-conspirators (Noranda) has acted through Kerramadex. Given the overlap on these two issues, and Bigbee's prior representation of Gulf "in its capacity as a uranium supplier," a substantial relationship exists.

Gulf's logic is superficially tantalizing, but a close examination of the facts reveals that Gulf has strained very hard to arrive at a miniscule overlap of two large and complex legal canvases. We are not going to lengthen an already tiresome opinion by staking out the broad outlines of these two undertakings. Where the scope of litigation reaches gargantuan dimensions in terms of time and complexity, two trends emerge. The theoretical opportunities for the use of information in multiple settings increases. And the lawyer's ability to define the exact nature of his legal services is correspondingly reduced. These consequences create tactical advantages for the party presenting a motion to disqualify, and

serious handicaps for the attorney opposing it. In addition, as the breadth of the representations increases, the court finds that the substantial relationship test becomes more and more unmanageable. The court must attempt a second-hand reconstruction of the earlier representation, through masses of cryptic billing statements, competing versions of stale conversations, and a myriad of legal documents.

We have reviewed all the documents submitted by Gulf and United Nuclear, and conclude that the asserted connections between the two representations by the Bigbee firm fall on the outer periphery of both cases, where the possibility of overlapping disclosures is insufficient to warrant disqualification. The Bigbee work for Gulf during 1971 through 1976 centered on perfecting title and handling mining claims to Gulf's property holdings at Mt. Taylor, as well as advancing Gulf's interests on water quality, environmental impact, tax and energy resource matters in the New Mexico state legislature. Bigbee has never represented Gulf in purchases or sales of uranium, or in antitrust matters. While Bigbee certainly did gain knowledge of Gulf's uranium properties during its work, its efforts were focused on real estate transactions connected with Gulf's untapped and undeveloped uranium reserves. The Westinghouse complaint contains a few scanty references to the alleged conspiratorial control of uranium production (Cf. ¶¶ 36, 39(b) and 46), but the heart of the complaint is directed at alleged price-fixing arrangements, fixing of contract terms, and withdrawal from the market of uranium supplies. The evidence pertinent to those allegations will focus on meetings and communications among the alleged co-conspirators, as well as evidence on uranium prices, terms and conditions of sale, and market availability. When the two Bigbee representations are viewed in their totality, Gulf's assertions that Bigbee a) has been aware of reasons for Gulf's delayed uranium production at Mt. Taylor and b) may have acquired some knowledge of Gulf's relationship with one of the joint owners of the property in the course of its title searches and real estate transactions, do not create persuasive connecting links to the Westinghouse action. In our view, Gulf's argument is equivalent to saying that apples and oranges are substantially related because both contain Vitamin C.[2]

Gulf has raised another ground for disqualification which presumes a substantial relationship between the two Bigbee engagements. It argues that Bigbee's intimate knowledge of the Mt. Taylor project and Gulf's relationship with Kerramadex may require Bigbee attorneys to testify in Gulf's defense to Westinghouse's charges of uranium curtailment and conspiracy, all to the detriment of its present client, United Nuclear. Because we have found no substantial relationship between the two representations, however, we see no reasonable possibility that Bigbee attorneys will have relevant testimony to offer here. Even if their testimony were relevant, it would probably be unnecessary, since other witnesses would have more direct knowledge of the Mt. Taylor properties.

Accordingly, Gulf's motion to disqualify the Bigbee firm is denied.

For the foregoing reasons an order will be entered denying all of the pending motions to disqualify counsel.

---

**2.** Gulf points to a statement in United Nuclear's answer to infer that Bigbee has in fact obtained confidential information related to the Westinghouse suit. In the answer, United Nuclear admits that it has obtained information about illegal Gulf activities designed to affect uranium market conditions "in the course of proceedings and discovery in other pending litigation, and elsewhere." A Bigbee attorney flatly denies that "elsewhere" refers to the firm's prior representation of Gulf. (Crout, ¶ 28). The "other pending litigation" refers to actions by United Nuclear against Gulf and other companies arising out of agreements by United Nuclear to supply uranium concentrates to a partnership of which Gulf was a member. In these actions, United Nuclear has charged Gulf with antitrust violations under New Mexico law. Bigbee has only represented United Nuclear in these lawsuits. (Bigbee, ¶¶ 10, 11, 15).